724 F.Supp. 888 (1987)
State Senator Carrie MEEK, et al., Plaintiffs,
v.
Governor Bob MARTINEZ, et al., Defendants.
No. 87-1233-CIV.
United States District Court, S.D. Florida.
December 11, 1987.
On Pending Motions February 21, 1989.
*889 *890 *891 *892 Jean Camper Cahn, Luis Fernandez, William E. Adams, Legal Svs. of Greater Miami, Inc., Chesterfield Smith, Marilyn Holifield, Miami, Fla., Filiberto Agusto, Steven Reed, Anita Lichtblau, Jonathan Cahn, Washington, D.C., for plaintiffs.
Steven A. Steiglitz, Marcia Rosen, Debra S. Kornbluh, State of Fla., Dept. of Health & Rehabilitation Services, Miami, Fla., William E. Whitley, Gainesville, Fla., Robert M. Hustead, Homestead, Fla., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
KEHOE, District Judge.
THIS CAUSE came on for trial before the Court on September 8-9, 1987. The following constitutes the Court's Findings of Fact and Conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

I. FINDINGS OF FACT

A. Stipulated Facts[1]
1. Federal funding to the states for nutrition and other services for the elderly is authorized under Title III of the Older Americans Act of 1965, as amended (hereinafter "OAA"). (The term "Title III" hereinafter refers to Title III of the Older Americans Act of 1965, as amended).
2. The federal funding described in paragraph 1, supra, is distributed through grants to the states from the Federal Administration on Aging, which is a division of the U.S. Department of Health and Human Services.
3. From the funds appropriated by Congress for grants under Title III, each state is allotted an amount based on the state's population age 60 and older in proportion to the national population age 60 and over.
4. In Florida for federal Fiscal Year (hereafter "FFY") 1987 the amount described in paragraph 3 is in excess of $40 million.
5. The State of Florida has designated the Florida Department of Health and Rehabilitative Services (hereinafter "DHRS") as the state agency responsible under the Older Americans Act for developing the State Plan, administering the State Plan, and coordinating all State activities related to the Older Americans Act.
6. Gregory Coler is the Secretary of DHRS.
7. As Secretary of DHRS, Gregory Coler is responsible for overseeing and has authority over the Aging and Adult Services Program Office within DHRS and its director.
8. Margaret Lynn Duggar is Director of the Aging and Adult Services Program Office within DHRS.
9. Within DHRS the primary responsibility for administering the Title III program is delegated to the Aging and Adult Services Program Office.
10. The State has designated the Aging and Adult Services Program Office as the official State Unit on Aging with respect to administering the State's obligations under the OAA.
11. The OAA requires the State Agency on Aging, DHRS to, inter alia, divide the state into planning and service areas (hereinafter "AAA") in each PSA; develop a formula for distribution within the state of funds received under Title III; and prepare and submit a State Plan to the Department of Health and Human Services Administration on Aging.
12. The term "PSA" means planning and service area, as defined in 42 U.S.C. § 3022(5).
13. The term "Florida State Plan" refers to the plan submitted by the State of *893 Florida as required by the OAA as a condition of receiving Title III funds for services to the elderly. This plan, inter alia, sets forth the State's method and rationale for distribution of Title III funds among the PSAs.
14. The current Florida State Plan is the Florida State Plan on Aging, 1987-90.
15. Bob Martinez is Governor of the State of Florida.
16. The Governor or his designee must approve the State Plan prior to its submission to the Department of Health and Human Services' Administration on Aging.
17. The State of Florida allocates funds for Title III Services among the PSAs through the use of an "intrastate funding formula" and distributes Title III funds for administration of programs through an "administrative formula."
18. Margaret Lynn Dugger, as Director of the Aging and Adult Services Program Office, supervises the professional staff, who have responsibility for the submission and authorship of the State Plan, and the coordination of Title III funds and programs.
19. There are eleven (11) AAAs within Florida corresponding to each of the eleven (11) Florida PSAs.
20. Each AAA is responsible for developing an area plan for the respective PSA in which the AAA is located. The area plans describes, inter alia, the programs which the AAA proposes to support with the Title III funding it will receive.
21. The AAAs submit these area plans to the HRS District Offices for approval and to the Office of Aging and Adult Services Program Office for review.
22. After approval of area plans, each AAA receives Title III funds from the State which are used to implement the Title III programs set forth in the area plans.
23. Upon approval of the area plan and execution of a contract with the State providing for receipt of Title III funds, a AAA may execute agreements with service providers.
24. Service providers are those entities which contract with the AAA to provide the types of services to the elderly provided for under Title III and described in the respective area plans.
25. The State of Florida adopted the existing intrastate funding formula for service monies in 1979.
26. The existing intrastate formula has not been changed since its adoption.
27. The intrastate funding formula presently used by the State of Florida for distribution of service monies under Title III of the Older Americans Act distributes Title III service monies to PSAs based on three factors: (1) the estimated number of persons residing in each PSA aged 60 years and above who are below the poverty level (hereinafter "60+ BPL"); (2) the estimated number of persons residing in each PSA who are 65 years of age or older and who live alone or with non-relatives (i.e. are "primary individuals") (hereinafter "65+ Living Alone"); and (3) the estimated number of persons residing in each PSA who are 75 years of age or older (hereinafter "75+").
28. "Below the poverty level" as used in the intrastate funding formula means the poverty level as designated by the U.S. Census Bureau.
29. The State's rationale for use of the 60+ BPL factor is that this factor is intended as an indicator of the proportion of the State's elderly population residing in each PSA who are in greatest economic need.
30. The State's rationale for use of the 65+ Living Alone factor is that this factor is intended as an indicator of the proportion of the State's elderly population residing in each PSA who are socially isolated.
31. The State's rationale for use of the 75+ factor is that this factor is intended as an indicator of the proportion of the State's elderly population residing in each PSA who are frail elderly.
32. The current administrative formula which is used to distribute OAA funds to the PSAs for administrative costs is based on the following four factors, each with a *894 weighting factor of 25%: (1) the number of persons age 60 and over in the PSA; (2) the number of counties in the PSA; (3) the dollar amount of OAA, Title III funds in the PSA; and (4) the dollar amount of funds allocated to the PSA under the Community Care for the Elderly program, a state funded program. The amount indicated by the formula is in addition to a base amount per district of $95,000. [State Plan at IV-6.] Prior to 1987, the administrative formula did not include the number of counties factor, but did include two other factors  number of square miles and number of service provider contracts administered.
33. The primary source of demographic data used by the State in allocating Title III funds to the respective PSAs is the 1980 National Census, which is periodically updated by the Florida Consensus Estimating Conference (hereinafter "FCEC"). The State uses the FCEC estimates of the state population by age and by county in applying its allocation formula.
34. The methodology DHRS uses to update the Florida Consensus Estimating Conference data for use with the intrastate funding formula is:
The population projections published by the Florida Concensus Estimating Conference provide the basic figures by age and by county. The populations in poverty and living alone are then computed by applying a percentage from the 1980 Census, which identified the number of individuals in these categories, to the new population projections.
35. DHRS uses a team for budget and policy decisions called the Budget Entity Team (hereinafter "BET"), which is a team composed of personnel from DHRS's three main branches: administration, planning and operations.
36. The BET is chaired by Defendant Margaret Lynn Duggar, and its membership includes, among others, Defendant June Noel.
37. On May 10, 1986, as the result of a decision made by the BET and approved by the relevant DHRS authorities, information and recommendations on removal of the hold harmless policy were sent by the DHRS Aging and Adult Services Program Office to HRS District Offices and AAAs.
38. Florida's 1986 Appropriations Act adopted by the State Legislature in June, 1986 included proviso language regarding the OAA intrastate funding formula. That proviso language states in pertinent part:
From funds provided in Specific Appropriation 725, the department (DHRS) shall develop an intra-state funding formula for the distribution of Older Americans Act monies which includes a proposal to phase out the hold-harmless component of the current formula over a five-year period. Prior to adoption of any revisions to the current distribution formula, the department shall submit the proposal to the chairmen of the legislative appropriations committees.
It is the intent of the Legislature that the department may develop several proposed alternative distribution formulas for Older Americans Act monies. One of the alternatives shall be submitted to the chairmen of the legislative appropriations committees for consulations prior to the adoption of any revisions to the current distribution formula.
39. Public hearings on the Florida State Plan on Aging, 1987-90 were held in Gainesville, (July 18, 1986); Boca Raton (July 22, 1986); and St. Petersburg (July 25, 1986).
40. The Florida State Plan on Aging, 1987-90 offered at public hearing reflected, among other HRS plans, a proposal to remove the hold harmless policy over a period ending in 1990, and to allocate funds to each PSA strictly according to the current intrastate funding formula beginning in 1990.
41. As a result of the operation of the hold harmless policy in past years, certain PSAs in the State receive more Title III funds than they would under the current intrastate funding formula. The State refers to those PSAs as "over equity." Other PSAs receive less in Title III funds than they would under the current intrastate *895 funding formula. The State refers to those PSAs as "under equity."
42. By the State's definitions, the PSAs that are "over equity" as of 1987 are: Districts II, IV, V, VI and XI. As the hold harmless policy is phased out and assuming the federal appropriation of OAA funds to Florida remains constant, the share of funds going to "over equity" PSAs is reduced and the share going to "under equity" PSAs is increased.
43. On July 24, 1986, the State of Florida sent forward the Florida State Plan on Aging, 1987-90 to the Department of Health and Human Services Administration on Aging. The Florida State Plan on Aging, 1987-90, as sent to the Administration on Aging, contained among other HRS plans a proposal to remove the hold harmless policy over a period ending in 1990. It also proposed to implement the current administrative formula described in paragraph 32, supra.
44. On September 8, 1986, a package containing information about the phase-out of the hold harmless policy was submitted to the Chairpersons of the Florida Senate and House Appropriation Committees.
45. On September 18, 1986, the Florida State Plan on Aging, 1987-90 was approved by the Atlanta Regional Office of the U.S. Department of Health and Human Services.
46. On October 8, 1986, the DHRS submitted a package containing information regarding the phase-out of the hold harmless policy to Glenn W. Robertson of the Office of Planning and Budgeting, Executive Office of the Governor.
47. On December 4, 1986, DHRS submitted an updated version of the proposal to phase out the hold harmless policy to Paul Belcher, Office of Planning and Budgeting, Executive Office of the Governor. This version updated the proposal based on the actual federal allocation of Title III funds to Florida for that federal fiscal year and based on updated demographic data from the Florida Consensus Estimating Conference.
48. By letter dated January 26, 1987, the chairs of the Senate and House Appropriations Committees, State Representative Sam Bell, III and State Senator James A. Scott, concurred in the proposal submitted to them.
49. The PSA funding level projections made by DHRS for the next three fiscal years were based on the adoption of the plan for phase-out of the hold harmless policy which assumed no increase in federal funding. The plan was submitted to the chairpersons of the legislative appropriations committees and adopted in the Florida State Plan on Aging, 1987-90.

B. Facts Established at Trial

50. Evidence presented at the final hearing establishes that District XI has the largest number and percentage of elderly, minority elderly, and poor elderly.
51. At the time DHRS adopted the intrastate funding formula in 1979, it did so subject to a "hold harmless" policy which ensured that, even if the intrastate funding formula allocated a smaller amount to a district than that district had received in prior years, the district's share of OAA funds would not decrease below the level of previous years. The hold harmless policy perpetuated the distribution pattern that existed under prior formulas, at least one of which included a minority factor. Elimination of the hold harmless policy effectively eliminated whatever distributional impact remained from the prior minority factor.
52. Full implementation of the intrastate funding formula through phase-out of the hold harmless policy diverts funds away from District XI, the PSA with the highest number of poor minority elderly. From 1986 to 1990, District XI will suffer cuts in OAA funding three times as large as any other district as a result of the phase-out of the hold harmless policy.
53. Based on the State's projections as of December 4, 1986, the effect of the formula is as follows:

*896
District 1988 1989 1990
 1 +6,910 +10,057 +16,692
 2 (-24,723) (-26,722) (-29,254)
 3 +35,749 +64,993 +126,377
 4 (-794) +25,074 +33,055
 5 (-34,127) (-67,853) (-133,369)
 6 +2,677 (-3,716) (-16,724)
 7 +36,945 +61,954 +113,286
 8 +43,743 +53,870 +103,527
 9 -42,569 +69,913 +126,205
 10 +6,155 (-5,787) (-28,940)
 11 (-115,104) (-181,783) (-310,853)

54. The Florida intrastate funding formula includes three factors, 60+ BPL (Below the Poverty Line), 65+ Living Alone and 75+. The formula uses these three factors to determine the allocation of Title III funds of the Older Americans Act among the eleven (11) PSAs in Florida.
55. The three factors are intended as indicators of social and economic need in the elderly population.
56. The 60+ BPL factor is intended to identify economic need. Because those living below the poverty level have clear economic need, this proxy is effective.
57. The 65+ Living Alone factor is not a proxy for social needs of the elderly. This factor has an inverse relation to both physical and social need.
58. The inaccuracy of this factor as an indicator of social need is confirmed by studies of individuals who fall into the category of 65 and Living Alone. Standard measures of disability Activities of Daily Living and Instrumental Activities of Daily Living (ADLs and IADLs) are the standard bases for assessing needs among the elderly. Persons who are able to perform all of the Activities of Daily Living are considered generally able to function independently; functional disability is measured in terms of the number of ADLs that cannot be performed.
59. National health statistics published in June 1986 show that 77% of the total population over 65 have no difficulty performing any ADLs.
60. Gerontological research demonstrates that the elderly most frequently seek to live alone as a means of preserving their independence and autonomy as long as possible. Typically, they seek out living arrangements with others only when they are no longer able to function independently.
61. Demographic data reveals that elderly persons living alone have substantially higher incomes than those living with family.
62. Persons with wealth will use it to obtain residential and lifestyle independence i.e., to live alone. Typically, only income deprivation will compel a person to trade off residential and lifestyle independence for a higher household income. Thus, "living alone," when applied to a population, is likely to indicate relative wealth, not need.
63. Defendants produced no credible evidence supporting the use of the 65+ Living Alone factor as a valid indicator of social or physical need.
64. Empirical studies and expert testimony also confirm that the decision to live with family strongly correlates with cultural or ethnic patterns. Minority elderly persons are more likely to live as part of an extended family than are white elderly persons. Thus, the 65+ Living Alone factor tends to identify elderly who are healthier, in less economic need and non-minority.
65. Living alone correlates with neither social isolation nor loneliness. Living Alone has no independent significance *897 as an indicator of loneliness or social isolation; it must be analyzed in conjunction with other factors: the existence or availability of a support group, economic status, cultural patterns and the voluntariness of the decision to live alone.
66. Thus, the 65+ Living Alone factor does not meet the first and fundamental test of a proxy: it does not correlate with the need it is intended to measure. Indeed, the record establishes that it correlates with a population least in need. 65+ Living Alone tends to be an indicator of wealth and well being, not need.
67. The factor 65+ Living Alone assigns preferential weight to those ethnic groups whose elderly members have a greater tendency to live alone; in particular, non-minorities.
68. Likewise, the 75+ factor is not a legitimate proxy for frailty, the characteristic in the population which it is designed to identify, since it lacks a demonstrable correlation with that characteristic.
69. Over 77% of those 75 years of age or older are not frail by gerontological standards. The use of 75+ as a factor therefore operates to target at least three elderly persons with no disability for every one elderly person who is frail or has a significant disability.
70. The State produced no credible evidence supporting its use of the 75+ factor as a means to target funds to the frail elderly.
71. It is not until age 85 and over that even one-half of the elderly population shows signs of frailty in terms of decreased ADLs.
72. Frailty and disability roughly correlate with increasing age but they correlate differently with different ages for different ethnic groups.
73. Minority groups have a shorter life expectancy than whites at every age. They also experience the onset of chronic disability at an earlier age.
74. A shorter life expectancy means that minority elderly persons over 75 necessarily comprise a substantially smaller percentage of the over 75 elderly than they do of the number of elderly over 60.
75. A distribution formula that assigns weight to 75 + distributes funds based on a demographic factor that excludes the acute and chronic health problems that the minority elderly tend to encounter at an earlier age. For those purposes, the factor is underinclusive as an indicator of frailty and disability.
76. A funding formula that includes a factor favoring those elderly over 75 tends to focus on survival, rather than economic or social need, to the direct disadvantage of groups with shorter life expectancies, i.e., non-whites.
77. The Florida intrastate funding formula does not contain a minority factor. A minority factor (i.e., 60+ MIN factor) is used in a large number of states as the means by which to pay particular attention to low income minorities.
78. Minority status is one of the best indicators of need among the elderly.
79. Ethnic status, specifically Black and Hispanic status, has been the best indicator of need among the elderly in Dade County in a 1987 needs assessment study conducted by the Southeast Center on Aging at Florida International University.
80. A minority factor was at one time included in a Florida funding formula under the OAA.
81. Of 36 states studied in a 1984 report on intrastate funding formulas under the OAA, and of 31 states which used an intrastate funding formula, 18 used a minority factor.
82. Pathways to the Future III, a December 1986 report of the Florida Committee on Aging, found that "minority elderly are the most disadvantaged groups in the U.S. and in Florida." The Florida Committee on Aging was an official state body appointed by the governor with participation by the legislature. The report was prepared with the assistance of DHRS and the participation of Defendants Duggar and Noel.
*898 83. Defendants agree with the following findings on pages 60-62 of the Pathways report:
Minorities generally experience more complicated problems and needs because of their minority status, different physical and cultural characteristics, and lower socio-economic status. More emphasis is needed on the part of state and area agencies on aging, to address unmet needs of this population in the daily activities of living ...
Furthermore, many ethnic minority elderly those [sic] older hispanics, Asians, and American Indians in Florida are also linguistically and culturally disadvantaged. About 66 percent of older hispanics, 40 percent older Asians, 33 percent of American Indians, and 10 percent of older blacks cannot speak English. Lack of English language skills frequently discourages many minority elderly from using needed supportive and nutrition services available in their communities. These significant differences were noted in the 1980 census on the educational attainment between whites and minorities ...
In summary, U.S. census reports, statewide survey findings, and minority aging studies all indicate that minority elderly are the most disadvantaged groups in the U.S. and in Florida. Consequently, the Aging and Adult Services Program Office and area agencies on aging should develop viable state policy and implementation strategies in order to adequately serve and care for our most disadvantaged and vulnerable Floridians, older minority elderly. (emphasis added).
84. Whether a particular formula targets the needs of minorities depends on the interaction between the formula and the demographic features of a state.
85. In the context of Florida's demographics, the intrastate funding formula takes no account of the particular needs of low income minorities.
86. The 60+ BPL factor fails to identify low income minorities not counted as below the poverty line in the 1980 Census.
87. Minority elderly have a disproportionate tendency to reside with children or other relatives in an extended family context. As a result, household income, which is the item measured by the Census, fails to identify these minorities whose individual incomes are frequently below the poverty level.
88. Furthermore, the distribution of census-counted elderly below the poverty level in Florida does not correlate with the distribution of minorities in Florida. In District XI there are nearly twice as many minority elderly as census-counted elderly below the poverty level.
89. The 60+ BPL factor therefore does not measure the proportions of low income minorities in a PSA population.
90. Neither the 65+ Living Alone nor the 75+ factor pays particular attention to low income minorities.
91. Hispanic elderly constitute a major proportion of Florida's elderly minority population. The formula makes no accommodation for the particular needs of this minority group which not only suffers higher incidence of health related and economic problems associated with minority status but which confronts language barriers, and cultural and social isolation.
92. Administratively feasible alternatives to the current formula exist. Numbers of minority residents in each district can be extrapolated from 1980 census figures. The census category of "minority" includes blacks, Hispanics, Asian-Americans, Native Americans, and other very small categories. The overlap between the black and Hispanic categories can be eliminated by isolating the black Hispanics, a figure given in the census, and deducting that number from the total number of Hispanics.
93. District III receives data on the percentage of minority elderly in the district.
94. If a minority factor was substituted for the 65+ Living Alone factor currently used in the Florida formula, funds would be shifted away from non-minority districts and towards minority districts. Even a pure 60+ BPL formula would alleviate the *899 non-minority slant of the current formula and would provide some targeting to minority districts.
95. The current intrastate funding formula results in a disparate impact on racial and/or ethnic minorities in Florida.
96. Because the actions challenged involve distributions to districts rather than to individuals, a disparate impact is shown by comparing the amount of funds allocated to the four highest and lowest percentage minority districts in Florida under the current intrastate funding formula with that amount which would be allocated to those same districts under a straight 60+ BPL formula.
97. The population figures used in this comparison are taken from Florida Concensus Estimating Conference data supplied by the State.
98. 60+ BPL is the baseline formula because that factor is the State's indicator of economic need as that term is defined by the OAA. The other factors tend to measure non-economic or social need. The question the comparison answers is in what direction the social need factors push the distribution of funds.
99. Based on the most recent applied figures from the Consensus Estimating Conference supplied by the State, the four Florida PSAs that have the highest percentage of minority are Districts I, II, IV and XI. Districts V, VIII, VIX and X have the lowest percentage of minority elderly in Florida.
100. The result of comparing the current Florida intrastate funding formula allocation against the 60+ BPL formula allocation is that the four highest minority percentage districts all receive less money under the current intrastate funding formula than they would using the 60+ BPL formula. The four districts with the lowest minority percentage, however, receive more money under the intrastate funding formula than they would under the 60+ BPL formula.
101. Set G-1 of Exhibit 24 reveals that if $1,000 were allocated among the eleven districts under the current intrastate funding formula, the "high minority" Districts I, II, VI and XI would receive, respectively, 45% less, 37% less, 18% less and 15% less than they would receive under a BPL-only formula. Plaintiffs' Exhibit No. 24 at 5.
102. This comparison reveals that the 65+ Living Alone and 75+ factors, the two factors not included in the hypothetical 60+ BPL formula, have the effect of shifting the distribution of funds away from minority districts and towards non-minority districts.
103. All other demographic characteristics being equal, a district with a higher concentration of minorities is worse off under the State's social need factors, 65+ Living Alone and 75+, than under a straight economic need or 60+ BPL allocation.
104. Of the two social need factors, the one that most contributes to the disparity caused by the intrastate funding formula is the 65+ Living Alone factor.
105. Despite the fact that minority status is expressly considered in the OAA as part of the social need dimension, those Florida PSAs with largest minority elderly populations would fare better financially under a formula that uses only the State's measure of economic need (60 + BPL) than the current combined economic/social need intrastate funding formula.
106. Plaintiff Area Agency on Aging ("AAA") for Dade and Monroe Counties is a private nonprofit agency whose essential function is to contract with service providers to provide service to the elderly under the OAA.
107. The removal of the hold harmless policy as described in the Florida State Plan on Aging, 1987-90 will result in a $200,000 decrease in funding to the District XI AAA beginning in 1988, assuming no increase in federal funding.
108. As a result of this funding decrease, the AAA will be required to cut back its program and to ask service providers to decrease services provided to the elderly in District XI on a "last-in, first-out" basis.
*900 109. Plaintiff Carrie Meek is a 61 year-old minority woman elected to the Florida State Senate from District 36, located in Dade County. She has endeavored to secure the revision of the Florida intrastate funding formula used to allocate Older Americans Act funds to each of the eleven Planning and Service Areas throughout the state to comply with federal requirements. Senator Meek has been involved in numerous Senate hearings on Florida's elderly and has been a member of the governing board of United Way, the organization designated by the state to serve as the area agency on aging for District XI.
110. Plaintiff Jack Gordon is a 65-year-old Florida State Senator elected from District 35, located in Dade County.
111. Plaintiff Adolfo Gonzales is a sixty-one year old person born in Cuba who arrived in Miami in January 1987. He and his wife depend on the Little Havana Center, a District XI service provider, for their meals and social contact with the outside world. Because Gonzales began using the Center nine months ago, he faces a possible threat of being cut from the program on a "last-in, first-out" basis.
112. Plaintiff Jim White is a 78-year-old Mexican-American resident of Miami. He has no living relatives and has used the transportation and meal services of a District XI service provider for seven years. He is dependent on the program for his weekday meals and all social contact. His only source of income is a monthly Social Security check for $356 that pays for rent, utilities, and weekend meals.
113. Plaintiff Antonia Diaz is a 65 year-old Miami resident who arrived in this country one year ago. She shares an efficiency apartment with her 60 year-old sister and receives $475 a month in food stamps, Medicaid prescriptions, and Supplemental Security Income. She and her sister have been dependent on the Little Havana Center since April 1987 for their main hot meal of the day and social contact. Because they did not begin using the Center until April 1987, they face a possible threat of being cut from the program under a "last-in, first-out" policy as a result of funding decreases.
114. Plaintiff Nina Jones is a 66 year-old widowed black woman living in a government-sponsored project in Miami. She has numerous health problems and has difficulty moving around. She receives $375 a month in Social Security and food stamps and depends on homemaker services provided through OAA funding to survive independently.
115. The federal Administration on Aging has approved the XXXX-XXXX Florida State Plan on the Aging.
116. Any of the foregoing Findings of Fact which constitute Conclusions of Law are hereby adopted as Conclusions of Law.

CONCLUSIONS OF LAW

A. Jurisdiction

1. Jurisdiction in this action is pursuant to 28 U.S.C. § 1331, which provides federal court jurisdiction in civil actions arising under the Constitution and laws of the United States, and 28 U.S.C. §§ 1343(a)(3) and (a)(4).
2. Plaintiffs seek injunctive and declaratory relief under 42 U.S.C. § 1983; the Older Americans Act and regulations promulgated thereunder; Title VI of the Civil Rights Act of 1964 and regulations promulgated thereunder; and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
3. This action challenges the validity of the intrastate funding formula by which the State of Florida distributes federal funds appropriated under the Older American Act, 42 U.S.C. §§ 3001, et seq. (1986), among the eleven PSAs in Florida.
4. The Court finds that the individually-named elderly Plaintiffs have failed to prove injury or threatened injury to themselves. These Plaintiffs claim that they may suffer decreased services as a result of the elimination of the hold harmless policy and implementation of the intrastate funding formula. However, evidence adduced at the trial demonstrates that this threatened injury is, at most, no more than *901 a possibility. This does not satisfy the constitutional requirement of standing to sue in federal court. Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); Church of Scientology Flag Serv. Organization v. City of Clearwater, 777 F.2d 598, 606 (11th Cir.1985).
5. The Court likewise concludes that Plaintiffs, State Senators Carrie Meek and Jack Gordon, do not have standing to bring this action. By their own admission, State Senators Meek and Gordon have not suffered individualized injury; rather, they are suing on behalf of their constituents. Exercise of the judicial power set forth in Article III of the Constitution, however, requires the presence of a personal, as opposed to a representative, stake in the outcome of the controversy. See Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); Randolph-Sheppard Vendors of America v. Weinberger, 602 F.Supp. 1007, 1012 (D.C.D.C. 1985).
6. The Court concludes that the Plaintiff AAA for Dade and Monroe Counties, does have standing. Although the AAA is not a traditional voluntary membership organization, that fact does not preclude its having standing to sue. See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Contrary to the State's allegation, the AAA is more than a creature of the State, established for the sole purpose of funneling funds to service providers. Rather, the OAA's legislative history reflects Congress's intention that the area agencies have the added function of serving as advocates on behalf of the needs of the elderly. See 1984 U.S.Code Cong. & Admin.News 2974, 2976. In view of this role, the Court rejects the State's contention that the AAA is precluded from suing for violations of the AAA, Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.
7. It is well-settled that an organization has standing when the organization itself suffers injury. Warth, 422 U.S. at 511, 95 S.Ct. at 2211; Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 261-2 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).
8. Injury to an organization's activities or projects confers direct standing. In light of the Findings of Fact, supra at paragraphs 113-115, the AAA's activities and projects have been injured by and/or are likely to suffer injury because of the phase-out of the "hold harmless" policy and the application of the State's intrastate funding formula to District XI. See, e.g., Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler, 789 F.2d 931, 939 (D.C.Cir.1986)
9. The AAA is within the zone of interests protected by the Act. See Older Americans Act, 42 U.S.C. § 3021(a) (1982) (purpose of Act is "to encourage and assist State and local agencies to ... serve older individuals by entering into new cooperative arrangements ... with the providers of supportive services.") (emphasis added); see also 42 U.S.C. § 3026(a)(6)(D) (Area plan must provide that the area agency "serve as the advocate and focal point for the elderly within the community ..."). To pass the "zone of interest" test, the plaintiff's interest must have a "plausible relationship to the policies underlying the [the statute]." Clark v. Securities Indus. Ass'n, 479 U.S. 388, 403, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987). Accord, City of Milwaukee v. Block, 823 F.2d 1158, 1166 (7th Cir.1987); DeLoss v. Department of Hous. & Urban Dev., 822 F.2d 1460, 1464 (8th Cir.1987). An indication of a congressional purpose to benefit the plaintiff is unnecessary. Clark, 479 U.S. at 397, 107 S.Ct. at 757. The AAA is a creature of the OAA and clearly its interest, that of assisting needy elderly individuals, has a "plausible relationship" to the policy underlying the Older Americans Act.
10. The AAA is also within the zone of interests protected by both the Fourteenth *902 Amendment, see Equal Employment Opportunity Commission v. Corry Jamestown Corp., 719 F.2d 1219, 1222 (3d Cir. 1983) (citing Santa Clara County v. Southern Pac. R.R., 118 U.S. 394, 396, 6 S.Ct. 1132, 1132, 30 L.Ed. 118 (1886)) (Fourteenth Amendment concept of "person" encompasses corporations); and Title VI. See 42 U.S.C. § 2000d (1982) ("no person in the United States shall, on the ground of race, ... be subjected to discrimination under any program or activity receiving Federal financial assistance"); 42 U.S.C. § 2000e ("term `person' includes ... associations, corporations, legal representatives ... [and] unincorporated organizations").
11. Since the Court has denied Plaintiffs' request for class certification, all claims predicated thereon are hereby DENIED.
12. Remedies pursuant to 42 U.S.C. § 1983 ("section 1983") are available against state officials who, under color of state law, deprive individuals of rights established under federal law. Silver v. Baggiano, 804 F.2d 1211, 1216 (11th Cir.1986).
13. In relevant part, 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
14. The Plaintiff AAA has established by a preponderance of the evidence that:
a. it is being deprived of rights secured by law;
b. this deprivation is occurring "under color of state law";
c. it has suffered an injury; and
d. there is a causal relationship between the injury suffered and the state action that abridged the Plaintiff's legal rights.
See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), ovrl'd in part on other grounds by Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
15. The Plaintiff is entitled to relief under section 1983 because the State's intrastate funding formula fails to comply with the requirements of the Older Americans Act (OAA).
16. A federal statute that requires a state to comply with certain conditions in order to qualify for federal funding creates enforceable rights under section 1983 for individuals who are deprived of the benefit of those conditions. Wright v. City of Roanoke Redevelopment & Housing Authority, 479 U.S. 418, 107 S.Ct. 766, 774, 93 L.Ed.2d 781 (1987); see also Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980); Silver v. Baggiano, 804 F.2d 1211, 1215 (11th Cir.1986). Under this principle, the OAA plainly provides Plaintiffs here with "rights" that can be enforced through 42 U.S.C. § 1983.
17. The Older Americans Act, 42 U.S.C. § 3021 et seq., provides federal grants to states for the purpose of supporting state programs that assist the elderly.
18. The Act requires, as a condition of funding, that states "shall ... provide assurances that preference will be given to providing services to older individuals with the greatest economic or social needs, with particular attention to low-income minority individuals, and include proposed methods of carrying out the preference in the state plan." Id. § 3025(a)(2)(E) (emphasis added).
19. The OAA requires states to develop an intrastate funding formula for the distribution within the state of funds received under the OAA. Id. § 3025(a)(2)(C).
20. The Act requires that the state's intrastate funding formula be published for review and comment with a descriptive statement applying the definitions of "greatest economic or social need." Id. § 3025(d)(1)(A). The term "greatest economic need" is defined in the Act as "need resulting from an income level at or below the poverty threshold established by the Bureau of the Census." Id. § 3025(d)(2).
*903 21. The term "greatest social need" is defined to mean "the need caused by noneconomic factors which include physical and mental disabilities, language barriers, and cultural or social isolation including that caused by racial or ethnic status ..." Id. (emphasis added).
22. The Act requires, as a further condition of funding, that "the State agency ... shall ... develop a[n] [intrastate funding] formula, in accordance with guidelines issued by the Commissioner." Id. § 3025(a)(2)(C) (emphasis added).
23. The implementing regulations "issued by the Commissioner" which the State is required to follow pursuant to 42 U.S.C. § 3025(a)(2)(C) provide specifically that the "particular attention" to minorities required by the OAA should be accounted for in the State's intrastate funding formula for distribution of funds:
[An intrastate funding formula] must reflect the proportion among the planning and service areas of persons aged 60 and over in greatest economic or social need and with particular attention to low income minority individuals.

45 C.F.R. § 1321.37 (1986) (emphasis added).
24. The Court concludes that the Plaintiff AAA has an enforceable right to intrastate funding formula that "reflect[s] the proportion among the planning and service areas of persons aged 60 and over in greatest economic or social need and with particular attention to low income minority individuals." Id.
25. This right is specifically embodied in the OAA's regulations. An agency's regulations are entitled to deference as a valid interpretation of a statute with respect to the existence and nature of the rights arising under the statute and are enforceable pursuant to section 1983.[2]Wright at 774; see also Samuels v. District of Columbia, 770 F.2d 184, 199 (D.C. Cir.1985) (section 1983 provides a remedy for violation of all federal laws, including federal regulations).
26. Compliance with the OAA regulations is a condition for the State of Florida to receive OAA funding. 42 U.S.C. § 3025(a).
27. The language of the OAA is mandatory rather than precatory. The statute provides "[t]hat the state agency ... shall ... provide assurances that preference will be given to providing services to older individuals with the greatest economic or social needs with particular attention to low-income minority individuals ..." 42 U.S.C. § 3025(a)(2)(E) (emphasis added). Furthermore, the Act requires that "the State agency ... shall ... develop a formula, in accordance with guidelines issued by the Commissioner ..." Id. § 3025(a)(2)(C) (emphasis added). The regulations say that the intrastate funding formula "must" reflect the proportion among the planning and service areas of persons aged 60 and over in greatest economic or social need with particular attention to low income minority individuals. 45 CFR § 1321.37.
28. The Act narrows the discretion of state officials by requiring the state to include the requisite minority targeting in its intrastate funding formula. Preference provisions, contained in federal grant-in-aid statutes similar to those in the OAA and its regulations, generally give rise to *904 actionable rights under section 1983. See, e.g., Crawford v. Janklow, 710 F.2d 1321, 1325-26 (8th Cir.1983) (preferential distribution of assistance to households with low incomes); accord Boles v. Earl, 601 F.Supp. 737, 743 (W.D.Wis.1985) (same).
29. Parties seeking to enforce federal law pursuant to section 1983 need not affirmatively demonstrate that Congress intended that the particular federal law involved be enforceable under section 1983. See, e.g., Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 20 n. 31, 101 S.Ct. 2615, 2626-7 n. 31, 69 L.Ed.2d 435 (1981). Nonetheless, the legislative history of the Act is fully consistent with enforcement under section 1983.[3]
30. Nothing in the legislative history indicates that Congress did not intend enforcement under section 1983.
31. Congress, furthermore, has not foreclosed enforcement through section 1983 by providing a comprehensive remedial scheme in the Act. Wright, 479 U.S. at 482, 107 S.Ct. at 770.
32. The Older Americans Act contains no private remedial scheme of the sort required by the Supreme Court to overcome the presumption that a section 1983 remedy is permissable. See id. 107 S.Ct. at 771-774. Indeed, the Act provides no hearing or other administrative mechanism available to individuals seeking redress against a formula which fails to comply with the Act. A hearing is provided to the State for disapproval of a State Plan only. There is no mechanism in the statute for judicial review of federal approval of a State Plan. 42 U.S.C. § 3027(c).
33. While approval by the federal government of the Florida State Plan is relevant to the Court's determination of Plaintiff's claims, see School Committee of the Town of Rockland v. Massachusetts Department of Education, 753 F.2d 169, 172 (1st Cir.1985), it does not foreclose independent judicial examination of whether, on its face or in operation, the intrastate funding formula fails to meet statutory, regulatory and/or constitutional requirements.
34. Defendants have violated the Plaintiff AAA's rights under the OAA. Since 1979, Florida's formula for distributing OAA funds has employed the following three factors: (1) the number of persons aged 60 and over whose income is below the poverty line (which targets "economic need"); (2) the number of persons aged 65 and over who are living alone (which allegedly targets "social isolation"); and (3) the number of persons aged 75 and over (which allegedly targets "fraility").
35. These factors  taken as a whole do not appropriately target Florida's elderly population in greatest economic or social need nor do they have the effect of giving "particular attention" to low-income minorities as required by the OAA.
36. While the 60 + BPL factor targets minorities to a limited extent, it fails to include those minority individuals who have a low income but who are not counted by the Census as below the poverty level. In Florida, the divergence between censuscounted individuals below the poverty level clearly results in the 60 + BPL factor not targeting minorities.
37. The State's other formula factors (65+ Living Alone and 75+) actually divert *905 funds away from districts with heavy populations of low income minorities in direct contravention of the Act and the regulations. Furthermore, the State's formula factor, 65+ Living Alone, which identifies elderly living alone as socially isolated, does not meet the OAA's definition of social isolation, which encompasses social isolation "caused by racial or ethnic status" which restricts an individual's ability to perform normal daily tasks or threatens his/her capacity to live independently. 42 U.S.C. § 3025(d).
38. The failure of the State to discharge its obligation to distribute the funds pursuant to an intrastate funding formula that conforms to statutory requirements is not remedied by the alleged targeting of minority elderly by the AAAs in their respective PSAs. Section 305 of the OAA sets forth the state's duty. 42 U.S.C. § 3025. A different section, section 306 of the OAA, sets forth the AAA's duty. 42 U.S.C. § 3026. These are clearly separate responsibilities independently imposed in the statute.
39. The other requirements of a section 1983 action have been met. The "under color of state law" element of a section 1983 action is satisfied by the involvement of state officials "clothed with the authority of the state and ... purporting to act thereunder." Sykes v. State of California, 497 F.2d 197, 200 n. 2 (9th Cir.1974) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 1605-6, 26 L.Ed.2d 142 (1970)).
40. Defendants and their predecessors formulated, approved and carried out the State's policy for the distribution of OAA funds while acting in their official capacity as Florida state officials.
41. The State's failure to comply with the requirements of the OAA has deprived and threatens to deprive elderly minority individuals in District XI and other districts of services funded under the OAA which those individuals would have received.
42. However, the Court finds nothing in the language of the OAA, the regulations promulgated thereunder or the Act's legislative history which reflects a requirement that the State must generate new statistics. Rather, the OAA's mandate is limited to use of the best state-wide statistics available. 42 U.S.C. § 3205(a)(2)(C). The Court further finds that Florida's intrastate funding formula takes into account, to the maximum extent feasible, the best available state-wide statistics on the geographic distribution of individuals aged 60 and older in the State.
43. The State's intrastate funding formula violates Title VI of the Civil Rights Act of 1964.
44. Title VI of the Civil Rights Act of 1964 prohibits discrimination under, exclusion from participation in, or denial of the benefits of "any program or activity receiving federal financial assistance" to any person on the basis of race, color, or national origin. 42 U.S.C. § 2000d (1981). The OAA is a federal program providing financial assistance to older people in Florida within the purview of Title VI.
45. The regulations promulgated by the Department of Health and Human Services to effectuate Title VI, 45 C.F.R. § 80 (1986), set forth the standard state officials and others must meet in distributing such federal funds:
A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals *906 of a particular race, color, or national origin.

Id. § 80.3(b)(2) (emphasis added).
46. These regulations incorporate a disparate impact standard enforceable under section 1983, Guardians Ass'n v. Civil Service Comm'n, 463 U.S. 582, 584, 103 S.Ct. 3221, 3223, 77 L.Ed.2d 866 (1983), making proof of discriminatory intent unnecessary under Title VI. See also id. at 584 n. 2, 103 S.Ct. at 3223 n. 2; Alexander v. Choate, 469 U.S. 287, 293, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985); accord Georgia State Conference v. Georgia, 775 F.2d 1403, 1417 (11th Cir.1985).
47. The procedure to be followed in evaluating a "disparate impact" claim under the Civil Rights Act is well-established:
The plaintiff must first show by a preponderance of the evidence that a facially neutral practice has a racially disproportionate effect, whereupon the burden shifts to the defendant to prove a substantial legitimate justification for its practice. The plaintiff then may ultimately prevail by proffering an equally effective alternative practice which results in less racial disproportionality or proof that the legitimate practices are a pretext for discrimination.
Georgia State Conference, 775 F.2d at 1417 (citations omitted).
48. The use of the official intrastate funding formula, in particular the alleged "social need" factors, results in a substantially adverse racially disparate impact on districts with a relatively high percentage of minority residents.
49. The 65+ Living Alone factor moves funds away from those Florida PSAs with the largest concentrations of minority elderly to those PSAs with the lowest concentration of minorities, resulting in a substantially disparate impact on districts with a higher percentage of minority elderly residents.
50. The 75+ factor in the State's intrastate funding formula, which is intended to identify the proportion of frail elderly in a population, has a disparate impact on minorities because it excludes minorities who become frail at earlier ages and because of the shorter life expectancy of minorities.
51. Removal of the hold harmless policy has a disparate impact on District XI, which has the highest concentration of minorities of any PSA in the state.
52. Implementation of the new administrative formula has a disparate impact on District XI, which has the highest concentration of minorities of any PSA in the State.
53. Defendants introduced no credible evidence to rebut Plaintiffs' prima facie case as to any or all of the factors in the intrastate funding formula.
54. Defendants did not introduce evidence that the intrastate funding formula bears a "manifest demonstrable relationship" to achieving the goals mandated by the OAA. Georgia State Conference, 775 F.2d at 1418.
55. The Plaintiff AAA has demonstrated that less discriminatory alternatives to the current formula are readily available and could be feasibly implemented.
56. For the same reasons discussed above in connection with the OAA, Plaintiffs' Title VI claim meets the test of "color of state law," injury and causation under 42 U.S.C. § 1983.
57. The Court finds that the Plaintiff AAA has failed to prove by a preponderance of the evidence that the Defendants have engaged in intentional discrimination. While the Court has concluded that the State's plan for the distribution of OAA funds has a racially disparate impact, see Conclusions of Law at paragraphs 43-56 supra, the Plaintiff has failed to establish proof of discriminatory intent on the part of any of the Defendants. The Court therefore rejects the Plaintiff's claim alleging Defendants' violation of the Equal Protection Clause of the Fourteenth Amendment. See Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).
*907 58. Any of the foregoing Conclusions of Law that may constitute Findings of Fact are hereby adopted as Findings of Fact.
59. Now, therefore, this Court:
a. enters an injunction prohibiting implementation of that portion of the State Plan requiring initiation of the phase-out of the "hold harmless" provision until such time as the State has revised the formula to bring it into compliance with federal law;
b. retains jurisdiction until the State has fully complied with the affirmative obligations imposed by the Older Americans Act.
c. requires that, in the interim, the Defendants file quarterly reports with this Court and with the Plaintiff AAA so that this Court may ascertain that satisfactory progress is being made to achieve full compliance with the law, or, in the alternative, order such additional remedy as circumstances may warrant;
d. enters a final order requiring the State to adopt a formula that eliminates the two existing discriminatory factors in its intrastate funding formula, 65+ Living Alone and 75+, and to incorporate a minority factor in said formula which adequately embodies the OAA's statutory mandate to give particular attention to low income minority elderly persons.
60. The Court retains jurisdiction over the issue of costs and attorneys' fees. Plaintiff AAA is hereby directed to submit any request for such costs and fees within ten (10) days of the date of this Order.
DONE AND ORDERED.

ON PENDING MOTIONS
THIS MATTER arises before the Court upon the hearing held January 4, 1989, on all pending motions. After careful consideration of counsel's oral argument, the applicable law and the entire record in this action, including all post-hearing memoranda, it is hereby ORDERED AND ADJUDGED as follows:
1. The motion of the Plaintiff, the Area Agency on Aging for Dade and Monroe Counties ("the AAA"), to substitute the Area Agency on Aging Committee ("the AAA Committee") as Plaintiff in this action is DENIED.
2. The Defendants' request that the United Way of Dade County, Inc., through its Board of Directors, be substituted for the AAA as Plaintiff is GRANTED.
3. The Plaintiffs' motion for enforcement of this Court's Final Judgment, entered January 5, 1988, incorporating the Findings of Fact and Conclusions of Law entered by this Court on December 11, 1987, is GRANTED. Pursuant to the Older Americans Act, 42 U.S.C. § 3001, et seq. (1986) ("the Act"), the State's intrastate funding formula must be published for public review and comment, id. at § 3025(a)(2)(C), and must contain, inter alia, "a numerical statement of the actual funding formula to be used" and "a demonstration of the allocation of funds, pursuant to the funding formula, to each planning and service area in the State." 42 U.S.C. § 3025(d)(1)(B)(D). While Florida's newly proposed formula contains factors which comport with the Act's mandate to "provide assurances that preference will be given to providing services to older individuals with the greatest economic or social needs, with particular attention to low-income minority individuals," id. at § 3025(a)(2)(E), the relative weight assigned to each of these factors effectively vitiates such compliance. In a study funded by the Administration on Aging, Plaintiffs' expert Dr. Neal Cutler, Professor of Gerontology at the University of Southern California and Staff Member for the United States Senate Committee on Aging, explained that
the presence of the same factor in several funding formulas does not necessarily mean that the factor has the same effect upon the allocation of Federal dollars in those different States. For example, virtually all States include an older poor component in their funding formulas. Yet the impact of POOR60 in allocating Federal funds concerns the relative importance it has compared to any other factors included in the formula.... The point is that the State Plans should disclose as part of their description of the *908 funding formulas, the reasons or rationale behind the choice of how important a given formula component is to be ...
Approaches to Best Practices in the Use of Intrastate Funding Formulas for Targeting Services to Older Americans at 20 (June 1983) (prepared for the Administration on Aging). See also 1984 U.S.Code Cong. & Admin.News 2983 (citing Study).
The States contends that the weight it proposes to assign to the formula factors is in keeping with the purposes of the Act. Even assuming the merit of the State's contention, the Court concludes that the weighting is impermissible since it "results in a substantially adverse racially disparate impact on districts with a relatively high percentage of minority residents," in violation of Title VI of the Civil Rights Act of 1964. Findings of Fact and Conclusions of Law at 37 (Dec. 11, 1987). The prevailing standard for evaluating a claim of disparate impact under Title VI is as follows:
The plaintiff must first show a preponderance of the evidence that a facially neutral practice has a racially disproportionate effect, whereupon the burden shifts to the defendant to prove a substantial legitimate justification for its practice. The plaintiff then may ultimately prevail by proffering an equally effective alternative practice which results in less racial disproportionality or proof that the legitimate practices are a pretext for discrimination.
Georgia State Conference v. Georgia, 775 F.2d 1403, 1417 (11th Cir.1985).
The Court finds, first, that the Plaintiffs have shown by a preponderance of the evidence that the facially neutral formula proposed by the State has a racially disproportionate effect. The Court further finds that the State has met its burden of proving a substantial legitimate justification for the formula. Finally, the Court concludes that the Title VI claim is meritorious, in view of the Plaintiffs' proffer of an effective alternative formula resulting in less racial disproportionality. That alternative formula consists of weightings of 25%, assigned to the factor of 60+; 50% assigned to the factor of 60+ below the poverty level; 10% assigned to the factor of disability; and 15% assigned to the factor of 60+ minority/125% below the poverty level. By its present ruling, the Court is by no means requiring the State to assign these specific weights to the formula factors. As Dr. Cutler stated in his affidavit submitted in support of the Plaintiffs' motion, "[There exist] [n]umerous variations on the weighting of the State's present four-factor formula "which would avoid the disparate impact prohibited by Title VI. Affidavit at 6. Rather, the Court simply is mandating the State to re-weight the factors pursuant to one of the "numerous variations" permissible under Title VI. Id.
6. In accordance with the ruling above, the State's motion, styled "Notice of Compliance with Court's Order," is DENIED. The State is to be commended for having complied with that portion of the Court's Order prohibiting it from phasing out the "hold harmless" policy, pending its adoption of a non-discriminatory funding formula, as well as for its proposal of new factors which comport with the requirements of the OAA and Title VI. Nevertheless, the State's failure to propose a weighting of factors consonant with Title VI precludes the granting of the State's motion at this time. This denial is, of course, without prejudice to the State's right to renew the motion upon its adoption of a funding formula fulfilling the requirements of Title VI.
DONE AND ORDERED.
NOTES
[1] The following Stipulation of Facts, which was filed on September 9, 1987 and which both Plaintiffs and Defendants have agreed to, is adopted and incorporated herein by this Court.
[2] The Administration on Aging, upon promulgation of the regulations in response to the 1984 OAA amendments, state:

The [1984] amendments [to the OAA] expand the provisions in section 305 which require each State agency to provide assurances that preference be given to older individuals with the greatest economic or social needs by specifying that in doing so it give "particular attention to low-income minority individuals." The minority preference statement refers directly to those in "greatest economic or social need." Therefore, it does not require changes in the interim final regulations to clarify or provide emphasis. However, criteria for the intrastate funding formula in § 1321.37 have been modified to include "low-income minority individuals....
Section 1321.37  modifies criteria for the intrastate funding formula to include "low income minority individuals."
50 Fed.Reg. 12947-12949 (April 1, 1985) (emphasis added).
[3] See S.Rep. No. 467, 98th Cong., 2d Sess. 18 (1984), 1984 U.S.Code Cong. & Admin.News 2991, (While noting that its intent is not to impose a proportionality requirement, Congress has nevertheless made clear that "State and area agencies should be required to place special emphasis on [older minority group members]") (emphasis added); 130 Cong.Rec. § 11859 (daily ed. Sept. 26, 1984) (Statement of Senator Grassley) ("[t]he conference agreement requires the state agencies and area agencies to give particular attention to the needs of low-income and minority individuals within the concept of the requirement that preference be given to older persons with the greatest economic or social needs") (emphasis added); id. at H10346 (Statement of Congressman Owens) ([a] "significant feature" of the OAA is the "now clearly stated requirement that minority people be served by the Act") (emphasis added); id. at H10346-47 (Statement of Congressman Rinaldo) ("the conference report refines the preference [for economic and social need] by requiring that particular attention be given to low-income minority individuals") (emphasis added).