66 F.3d 819
 The CITY OF CHICAGO and Donald R. Smith, in his official
capacity as Commissioner of the Chicago Department
on Aging, Plaintiffs-Appellees, Cross-Appellants,
v.
Maralee I. LINDLEY, in her official capacity as Director of
the Illinois Department on Aging,
Defendant-Appellant, Cross-Appellee.
 Nos. 94-3506, 94-3507, 94-3844 and 94-3891.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 7, 1995.
Decided Sept. 8, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied Nov. 22, 1995.
 
 Susan R. Lichtenstein, Stuart D. Fullerton (argued), Andrew S. Mine, Susan S. Sher, Lawrence Rosenthal, Deputy Corp. Counsel, Benner R. Solomon, Office of the Corporation Counsel, Appeals Division, Chicago, IL, and Robert J. Smith, Jr., and Cacilia R. Masover, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for plaintiffs.
 Jerald S. Post, Asst. Atty. Gen. (argued), Wallace Solberg, and James E. Ryan, States Atty., Office of the Attorney General, Civil Appeals Division, Chicago, IL, for defendant.
 Robert J. Smith, Jr. and Cacilia R. Masover, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for amici curiae.
 Before CUMMINGS, EASTERBROOK and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 The Director of the Illinois Department on Aging appeals the decision of the district court, which determined that relevant provisions of the Older Americans Act (OAA), 42 U.S.C. Secs. 3001-3058ee, were enforceable under 42 U.S.C. Sec. 1983, and subsequently held that Illinois' formula for distributing funds to the State's older individuals violated the OAA. The City of Chicago cross appeals. It challenges the district court's determination that the state formula did not violate regulations promulgated pursuant to Title VI of the 1964 Civil Rights Act. It also contends that the district court erred in holding that it was barred by the Eleventh Amendment from ordering the State to disburse additional OAA funds to the City in the future to remedy the State's past violations. For the reasons that follow, we reverse the district court's decision that a private cause of action exists under Sec. 1983 for enforcing the relevant provisions of the OAA, and remand with instructions that the district court dismiss the City's claim. We affirm the district court's decision that the formula does not violate regulations promulgated pursuant to Title VI.
 
 
 2
 * BACKGROUND
 
 A. Statutory Scheme
 
 3
 Under the Older Americans Act, 42 U.S.C. Secs. 3001-3058ee, the federal government distributes funds to the states each year. The states use these funds to provide a wide range of services to their "older individuals," whom the statute defines as individuals "60 years of age or older." 42 U.S.C. Sec. 3002(38). The OAA requires each state to designate an agency responsible for creating a formula to determine the intrastate distribution of OAA funds. Id. Sec. 3025(a)(1)(A). That state agency must, in turn, divide the state into subdivisions known as "planning and service areas," or "PSAs," and must designate an area agency on aging for each PSA. Id. Sec. 3025(a)(1)(E).[1] In Illinois, the state agency is the Illinois Department on Aging (IDoA). The State is divided into thirteen PSAs, one of which comprises the entire City of Chicago. The area agency for the City of Chicago is known as the Chicago Department on Aging.
 
 
 4
 Pursuant to 1992 amendments to the OAA, each state agency is required to submit its proposed distribution formula to the federal Administration on Aging (AoA) for "approval." 42 U.S.C. Sec. 3025(a)(2)(D); see also 45 C.F.R. Secs. 1321.77-1321.83 (setting forth hearing procedures); prior versions of the statute required merely an opportunity for federal "review and comment." Under present law, however, the federal AoA may not approve a state plan unless it determines that the state agency's intrastate funding formula complies with the requirements of 42 U.S.C. Sec. 3025(a)(2)(C). See 42 U.S.C. Sec. 3024(c). Section 3025(a)(2)(C) requires that each state agency:
 
 
 5
 in consultation with area agencies, in accordance with guidelines issued by the Commissioner, and using the best available data, develop and publish for review and comment a formula for distribution within the State of funds received under this title that takes into account--
 
 
 6
 (i) the geographical distribution of older individuals in the State; and
 
 
 7
 (ii) the distribution among planning and service areas of older individuals with greatest economic need and older individuals with greatest social need, with particular attention to low-income minority older individuals.
 
 
 8
 42 U.S.C. Sec. 3025(a)(2)(C). The statute defines "greatest economic need" as "the need resulting from an income level at or below the poverty line." Id. Sec. 3002(29). "Greatest social need" is defined as
 
 
 9
 the need caused by noneconomic factors, which include--
 
 
 10
 (A) physical and mental disabilities;
 
 
 11
 (B) language barriers; and
 
 
 12
 (C) cultural, social, or geographical isolation, including isolation caused by racial or ethnic status, that--
 
 
 13
 (i) restricts the ability of an individual to perform normal daily tasks; or
 
 
 14
 (ii) threatens the capacity of the individual to live independently.
 
 
 15
 42 U.S.C. Sec. 3002(30).
 
 B. Facts
 
 16
 In 1992, Maralee Lindley, Director of the IDoA, developed a distribution formula that allocated Illinois' OAA funds based upon a series of population factors. Pursuant to 89 Ill.Admin.Code Sec. 230.45(c), Lindley did not include any factors that failed to account for at least five percent of the State's older individuals.[2] The State's final distribution formula relied upon six factors that were assigned various percentage weights:See 89 Ill.Admin.Code Sec. 230.45(e)-(f). The percentage weights represented the amount of total OAA funds allocated to the particular factor in the formula. Each PSA, in turn, received funds in proportion to the percentage of Illinois' residents in each of the above categories who resided in the PSA.[3] Once the area agency on aging for a particular PSA received its money, however, it was free to spend it as it chose; nothing in the OAA requires the area agency on aging to adhere to the State formula's distribution percentages when it actually spends OAA funds.
 
 C. Earlier Proceedings
 
 17
 Lindley submitted her formula to the federal Administration on Aging and obtained its approval. Subsequently, the City of Chicago (City) challenged Lindley's formula in this action in the district court. The City argued that Lindley's formula violated the OAA because it failed to consider factors relating to disability and language barriers. The City also alleged that the funding formula discriminated against minorities in violation of Title VI of the 1964 Civil Rights Act and its implementing regulations. Both parties moved for summary judgment.
 
 
 18
 The district court ruled in the City's favor on its OAA claim. Initially, the court determined that the OAA was not too vague to create rights enforceable under 42 U.S.C. Sec. 1983.[4] The district court focused upon the statutory language that required funding formulae to "take[ ] into account" the distribution of individuals with greatest social need, whom the statute defines as including those with "physical and mental disabilities" and "language barriers." In the district court's view, this language required funding formulae to include factors corresponding to older individuals with disabilities and language barriers. The court then reasoned that Congress did not intend to foreclose private enforcement of the OAA by requiring the federal AoA to approve all funding formulae.
 
 
 19
 The district court subsequently concluded that Lindley's formula did not "take into account" older individuals with disabilities or language barriers. It rejected Lindley's claim that the minority and 75+ factors already accounted for these individuals. Although it recognized that these factors did in fact distribute increased funds on the basis of disability and language barriers, the court reasoned that the minority factor overlooked residents of European descent who did not speak English well and that the 75+ factor was underinclusive of those with disabilities. It noted that census data identifying those with "mobility" or "self-care" limitations was more accurate than the 75+ proxy. Accordingly, it granted summary judgment to the City, and ordered Lindley to develop a new formula. The court rejected, however, the City's request for an order requiring Lindley to reallocate funds to remedy the harm caused by the underinclusive distribution formula. It reasoned that this claim was barred by the Eleventh Amendment and noted that, in any event, the City had not offered a concrete measure of damages.
 
 
 20
 The district court rejected the City's Title VI claims. It concluded that the City's intentional discrimination claim was without merit because the City had not shown that Lindley chose the rural and 75+ factors because they discriminated against minorities. With respect to the City's disparate impact claim, the district court stated that the City had not shown that Lindley's formula had a substantially disparate impact on minorities. In the alternative, it held that Lindley had an important interest in employing the 75+ and rural criteria, namely, her desire to ensure that PSAs with greater demand for services received greater amounts of funds.[5]
 
 II
 DISCUSSION
 
 21
 We review de novo a district court's grant of summary judgment. Green v. Shalala, 51 F.3d 96, 99 (7th Cir.1995). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. In the course of our review, we turn first to the arguments at issue in Director Lindley's appeal.
 
 A. Lindley's Appeal
 
 22
 Lindley submits that the OAA does not create rights privately enforceable under Sec. 1983. She contends specifically that the statutory command that funding formulae take factors "into account" is too ambiguous to be judicially enforceable. She also maintains that the amendment to the OAA that required federal approval of each state's funding formula makes clear that Congress did not intend that the OAA be enforced by private citizens. Alternatively, Lindley argues that her formula adequately accounts for the State's disabled and linguistically isolated. She submits that her existing formula, through its 75+ and minority factors, directs funds toward PSAs on the basis of their number of disabled and linguistically isolated individuals and thus "takes account of" them. She also contends that the phrase "best available data" does not require use of exclusive factors for language barriers and disabilities and argues that nothing in that requirement prohibits her from eliminating characteristics affecting too small a portion of the population to be useful measuring criteria.
 
 
 23
 The City responds that the OAA creates a private right of action under Sec. 1983. The statutory language, the City submits, unambiguously requires Lindley to develop a formula that takes into account the distribution of older individuals hindered by disability or language barriers. Congress' requirement of federal "approval" of state funding formulae, the City contends, was not intended to foreclose a private right of action. Finally, the City argues that Lindley's formula violates the OAA because it fails to use the best available data to take account of disability and language barriers.
 
 1.
 
 24
 We turn first to whether the requirements of the OAA may be enforced under 42 U.S.C. Sec. 1983. In Maine v. Thiboutot, 448 U.S. 1, 6-8, 100 S.Ct. 2502, 2505-06, 65 L.Ed.2d 555 (1980), the Supreme Court recognized that parties may rely upon Sec. 1983 to challenge violations of federal statutes.[6] However, not all violations of a federal statute give rise to Sec. 1983 actions. Suter v. Artist M., 503 U.S. 347, 355-56, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992); Clifton v. Schafer, 969 F.2d 278, 283 (7th Cir.1992). Because Sec. 1983 "speaks in terms of 'rights, privileges, or immunities,' not violations of federal law," Golden State Transit Corp. v. City of L.A., 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989), the particular federal statute at issue must itself create rights that are enforceable under Sec. 1983. Miller v. Whitburn, 10 F.3d 1315, 1319 (7th Cir.1993) (citing Wright v. Roanoke Redev. & Hous. Auth., 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)); Clifton, 969 F.2d at 283. Absent such enforceable rights, a cause of action under Sec. 1983 is unavailable. Suter, 503 U.S. at 356, 112 S.Ct. at 1366. In addition, even if a statute creates such rights, a cause of action under Sec. 1983 may be unavailable if Congress " 'foreclose[s] such enforcement ... in the enactment itself.' " Id. at 355-56, 112 S.Ct. at 1366 (quoting Wright, 479 U.S. at 423, 107 S.Ct. at 770); see also Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) ("A plaintiff alleging a violation of a federal statute will be permitted to sue under Sec. 1983 unless (1) 'the statute [does] not create enforceable rights, privileges, or immunities within the meaning of Sec. 1983,' or (2) 'Congress has foreclosed such enforcement of the statute in the enactment itself.' ") (quoting Wright, 479 U.S. at 423, 107 S.Ct. at 770). In Miller, we noted that a statute creates a right enforceable under Sec. 1983 if
 
 
 25
 (1) it was intended to benefit the putative plaintiffs,
 
 
 26
 (2) it imposes a binding obligation on the governmental unit rather than merely expressing a "congressional preference" for a certain kind of conduct, and
 
 
 27
 (3) the interest asserted by the plaintiff is not so vague or amorphous that it is beyond the competence of the judiciary to enforce.
 
 
 28
 10 F.3d at 1319; see also Wilder, 496 U.S. at 509, 110 S.Ct. at 2517.[7]
 
 2.
 
 29
 We now apply these principles to the relevant portions of the OAA. As we have outlined above, the OAA requires each state agency on aging to use "the best available data" to develop a distribution formula "that takes into account" the geographical distribution of older individuals within the state, as well as the distribution of those individuals in greatest economic and social need, with "particular attention" to low-income minority older individuals. See 42 U.S.C. Sec. 3025(a)(2)(C). In evaluating whether this language creates rights enforceable under Sec. 1983, we are guided by the Supreme Court's recent analyses in Wilder and Suter.
 
 
 30
 a.
 
 
 31
 In Wilder v. Virginia Hospital Ass'n, the Court considered whether the Boren Amendment to the Medicaid Act created rights enforceable under Sec. 1983. In relevant part, the amendment required that health care providers be reimbursed at rates
 
 
 32
 which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities[.]
 
 
 33
 496 U.S. at 503, 110 S.Ct. at 2514 (citing 42 U.S.C. Sec. 1396a(a)(13)(A)). The Court determined that this provision created rights enforceable under Sec. 1983. First, the Court set forth the three-part test outlined above. See id. at 509, 110 S.Ct. at 2517. Applying this test to the pertinent statute, the Court noted that there was little doubt that health care providers were the intended beneficiaries of the Boren Amendment. Id. at 510, 110 S.Ct. at 2517. Focusing upon the statutory language, the Court commented that the "Boren Amendment is cast in mandatory rather than precatory terms: the state plan 'must' 'provide for payment ... of hospitals' according to rates the State finds are reasonable and adequate." Id. at 512, 110 S.Ct. at 2518. The Court rejected the argument that the requirement that rates be "reasonable and adequate" was too amorphous to be judicially enforceable. It reasoned that, although the amendment afforded the States wide discretion, it was not beyond judicial competence to determine, on the basis of a record made by the parties, whether the rates were reasonable. Id. at 520, 110 S.Ct. at 2523. Finally, the Court determined that Congress had not foreclosed enforcement under Sec. 1983 by providing for review of state rates by the Secretary of Health and Human Services. The Court noted that it had held remedial schemes established by Congress sufficient to foreclose a Sec. 1983 remedy on only two occasions. Id. at 521, 110 S.Ct. at 2523 (citing Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)). In each instance, Congress had established comprehensive enforcement schemes in the text of the relevant statutes.[8] The Court determined that, although it authorized the Secretary to withhold approval of plans or to curtail the flow of federal funds to states whose plans did not comply with the Medicare Act, the administrative scheme established by the Boren Amendment was not "sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of Sec. 1983." 496 U.S. at 522, 110 S.Ct. at 2524. The Court noted that this conclusion was particularly appropriate in the case of the Medicare Act because the Boren Amendment to the statute evidenced an intent to reduce "the role of the Secretary in determining methods for calculating payment rates." Id.
 
 
 34
 Two years after Wilder, the Court decided Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). The federal statute at issue in Suter, the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. Secs. 620-628, 670-679a (Adoption Act), provided for federal reimbursement of a portion of the expenses states incurred in administering foster care and adoption programs. To obtain federal reimbursement, the states had to "submit a plan to the Secretary of Health and Human Services for approval." Id. at 351, 112 S.Ct. at 1363-64. The statute delineated sixteen requirements that each state plan had to satisfy. Among these was a requirement that the state plan provide
 
 
 35
 that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home[.]
 
 
 36
 Id. (citing 42 U.S.C. Sec. 671(a)(15)). The Court determined that this provision did not create rights enforceable under Sec. 1983. Initially, it stated that, although the Act was "mandatory in its terms," whether it created rights enforceable under Sec. 1983 required analysis of "exactly what is required of States by the Act." Id. at 358, 112 S.Ct. at 1367. Examining the statute, the Court noted that the requirement placed on the states went only "so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features." Id. The Court recognized the similarities between the Adoption Act at issue in Suter and the statutory language it had considered in Wilder, but distinguished Wilder on the ground that the Boren Amendment had "set forth in some detail the factors to be considered in determining the methods for calculating rates." 503 U.S. at 359, 112 S.Ct. at 1368. In contrast, the Court reasoned, the Adoption Act provided no further guidance "as to how 'reasonable efforts' are to be measured." Id. at 360, 112 S.Ct. at 1368. The Court found additional support for its determination that no Sec. 1983 remedy was available in the provisions of the Adoption Act which provided enforcement mechanisms for the "reasonable efforts" clause. The statute afforded the Secretary authority to reduce or to eliminate payments to states whose plans did not comply with the statutory requirements. Also, in cases involving children who had been removed involuntarily from their homes, the statute required a judicial determination that continued habitation would be contrary to the child's welfare before states could receive federal reimbursement. See id. The Court commented that, although these statutory provisions might not constitute a "comprehensive enforcement mechanism" evidencing Congress' intent to foreclose remedies under Sec. 1983, they did demonstrate that "the absence of a remedy to private plaintiffs under Sec. 1983 [did] not make the reasonable efforts clause a dead letter." Id. at 360-61, 112 S.Ct. at 1368-69. Finally, the Court considered the regulations promulgated by the Secretary to enforce the Act. It noted that they were not specific and did not "provide notice to the States that failure to do anything other than submit a plan with the requisite features, to be approved by the Secretary, is a further condition on the receipt of funds from the Federal Government." Id. at 362, 112 S.Ct. at 1369.
 
 
 37
 b.
 
 
 38
 Suter teaches that each statute "must be interpreted by its own terms." 503 U.S. at 358 n. 8, 112 S.Ct. at 1367 n. 8. Mindful of this command, our focus must be on the statutory scheme at issue in this case, taken in its totality. After analyzing the OAA on this basis, we conclude that 42 U.S.C. Sec. 3025(a)(2)(C) does not create rights enforceable under Sec. 1983 because its standards are too amorphous to be judicially enforceable. See Wilder, 496 U.S. at 509, 110 S.Ct. at 2516; Miller, 10 F.3d at 1319. Although the OAA is "mandatory" in its terms, we must, consistent with Suter, consider "exactly what is required of States by the Act." Suter, 503 U.S. at 358, 112 S.Ct. at 1367. The OAA requires that states develop formulae for distributing OAA funds which use the "best available data" that "takes into account" older individuals with greatest economic and social need, paying "particular attention" to low-income minority individuals. See 42 U.S.C. Sec. 3025(a)(2)(C). However, the statute provides no additional guidance as to how the formulae are to "take into account" these individuals. Cf. Suter, 503 U.S. at 360, 112 S.Ct. at 1368. Section 3025(a)(2)(E) does require states to "provide assurances that preference will be given" to the groups mentioned in 42 U.S.C. Sec. 3025(a)(2)(C); however, this provision simply recasts the language in section 3025(a)(2)(C) without further explicating it. Thus, courts are left with an amorphous provision. The statute gives no explicit guidance as to whether a state formula must include a factor for each and every subclass of older individuals. Nor does it address whether a formula will be considered to have taken account of a factor if, as in the case of Director Lindley's formula, it excludes the factor because few people in the state fall into the category the factor represents. It gives no guidance about a formula that, as the district court found with respect to Lindley's, distributes increased funds with respect to particular categories of individuals, even though it does not contain a factor corresponding to those particular categories. In sum, the OAA does not mandate explicitly that state formulae include specific numbers or types of funding factors. Cf. Miller, 10 F.3d at 1319 ("[A] Sec. 1983 action is unavailable if the federal statute at issue merely condition[s] a state's receipt of federal funds on the adoption of a plan satisfying certain criteria.").
 
 
 39
 Moreover, the relevant version of the OAA, like the statute at issue in Suter, requires that state funding formulae be submitted to the federal Administration on Aging for "approval." 42 U.S.C. Sec. 3025(a)(2)(D). Further, the OAA provides that each state funding formula should be developed "in consultation with area agencies." Id. Sec. 3025(a)(2)(C). These provisions, while not necessarily indicating that Congress intended to foreclose a Sec. 1983 remedy in the OAA itself, make clear that the absence of such a remedy does "not make the ['takes into account'] clause a dead letter." Suter, 503 U.S. at 360-61, 112 S.Ct. at 1368-69; see also Martinez v. Wilson, 32 F.3d 1415, 1420 (9th Cir.1994) ("The 1992 amendments to [the OAA] plainly give the Secretary, not the courts, primary responsibility for assuring that state [intrastate funding formulae] conform to the Act's requirements as a condition of receiving federal funds."). Finally, as in Suter, the implementing regulations provide no additional guidance. The relevant regulation merely requires that each state's funding formula "reflect the proportion among the planning and service areas of persons age 60 and over in greatest economic or social need with particular attention to low-income minority individuals." 45 C.F.R. Sec. 1321.37(a). This provision tracks the amorphous statutory language set forth in 42 U.S.C. Sec. 3025(a)(2)(C). Cf. Martinez, 32 F.3d at 1421 n. 4 ("The implementing regulations are no clearer [than the OAA.]"); Appalachian Agency for Senior Citizens v. Bland, 775 F.Supp. 191, 196 (W.D.Va.1991) (quoting section 1321.37(a) and noting, "[n]o further direction is given to the states for developing formulas"). Accordingly, we hold that the City does not have a right, enforceable under Sec. 1983, to challenge the particular factors that are included in or excluded from Lindley's funding formula. The OAA's requirements set forth in 42 U.S.C. Sec. 3025(a)(2)(C) are too amorphous to create rights enforceable under Sec. 1983.
 
 
 40
 Our conclusion is bolstered by the Ninth Circuit's recent decision in Martinez v. Wilson, 32 F.3d 1415, 1420 (9th Cir.1994). In Martinez, the court considered whether there was a private cause of action under Sec. 1983 for a group of cities that, as area agencies on aging, wanted to challenge the weights assigned to various factors included in the State of California's OAA funding formula. The Ninth Circuit concluded that no private remedy enforceable under Sec. 1983 existed. After reviewing the OAA, the court reasoned that "[b]eyond the vague requirements that the [formula] 'take into account' or pay 'particular attention' to certain categories of older individuals, the Act provides no guidance as to how these phrases should be translated into specific percentages in any [formula]. There are no judicially manageable standards here." 32 F.3d at 1421. Although our case involves a challenge to the particular factors included in the formula, rather than the weights assigned to these factors, we agree that the "vague requirements" of the statute fail to provide sufficient guidance to render the Act judicially enforceable.[9]
 
 B. The City's Cross Appeal[10]
 1.
 
 41
 Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. Sec. 2000d. Although "Title VI itself directly reache[s] only instances of intentional discrimination," Alexander v. Choate, 469 U.S. 287, 293 & n. 8, 105 S.Ct. 712, 716 & n. 8, 83 L.Ed.2d 661 (1985) (citing Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)), "actions having an unjustifiable disparate impact on minorities [may] be redressed through agency regulations designed to implement the purposes of Title VI." Id. at 293 & n. 9, 105 S.Ct. at 716 & n. 9; see also Craft v. Board of Trustees, 793 F.2d 140, 142 (7th Cir.) (per curiam), cert. denied, 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986). Among these regulations, 45 C.F.R. Sec. 80.3(b)(2), which applies to programs administered by the Department of Health and Human Services, provides, in relevant part, that recipients of federal funds may not, in the course of redistributing those funds:
 
 
 42
 directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.
 
 
 43
 Based upon this regulation, the City submits that Lindley's use of the 75+ and rural factors in her funding formula, in place of disability and language barrier factors, has the effect of discriminating against minorities. The City notes that, although 13.7% of Illinois' older individuals are minorities, only 10.7% of the State's population over the age of seventy-five are minorities and that older individuals living in rural areas are 98% non-minority. Lindley responds that her formula explicitly distributes, via the minority factor, 10% of all federal OAA funds to PSAs based exclusively on the number of minority older individuals living there. The poverty factor, which accounts for 25% of fund distributions, also favors PSAs containing higher populations of older minority individuals, a great number of whom live in poverty. Lindley then emphasizes that her formula disburses 29.14% of the State's OAA funds to Chicago even though the City contains only 23% of the State's older individuals. Moreover, she notes, the 75+ and rural factors do not exclude minorities. Finally, Lindley submits that her use of the 75+ and rural factors comports with the goals of the OAA because these factors help ensure that OAA funds are provided to older individuals who are in greatest need.[11]
 
 2.
 
 44
 Lindley's formula, without question, distributes more OAA funds to a PSA as the number of minority older individuals residing there increases. The formula's "minority factor" allocates 10% of all OAA funds solely on this basis. Indeed, this factor contributes substantially to the Chicago PSA's ability to garner over 29% of all OAA distributions even though only 23% of Illinois' older individuals actually reside in the Chicago PSA. The fact that the City's higher concentration of minority older individuals allows it to receive substantially more funds than it would were the funds distributed pro rata suggests that the City's claim that the formula has a disparate impact on minorities is without merit.
 
 
 45
 The City disagrees, citing Connecticut v. Teal, 457 U.S. 440, 450-51, 102 S.Ct. 2525, 2532-33, 73 L.Ed.2d 130 (1982), for the proposition that the favorable result generated by Lindley's formula is "not a permissible defense if the formula includes factors with a racially disparate impact." Appellee's Br. at 43 n. 22. Teal was a Title VII case, not a case brought under regulations promulgated to effectuate Title VI. In Teal, a group of African-American employees challenged the promotion system of a state agency. The promotion process consisted of multiple steps, the first of which required applicants to achieve a passing score on a written examination. See 457 U.S. at 443, 102 S.Ct. at 2528. Far fewer African-Americans than whites passed this examination, and those who failed were excluded from the pool of candidates eligible for promotion. Id. at 443-44, 102 S.Ct. at 2528-29. However, the state agency ensured that sufficient numbers of African-Americans from among those who passed the test received promotions so that, ultimately, a much higher percentage of African-American than white test-takers actually earned a promotion. See id. at 444, 102 S.Ct. at 2529. The state claimed that this result eliminated any disparate impact generated by the examination, but the Court disagreed. Focusing upon the fact that the relevant provision of Title VII created a "discriminatory bar to opportunities," id. at 450, 102 S.Ct. at 2532 (emphasis in original), the Court reasoned that measuring disparate impact "only at the bottom line ignores the fact that Title VII guarantees these individual respondents the opportunity to compete equally with white workers on the basis of job-related criteria." Id. at 451, 102 S.Ct. at 2533 (emphasis in original). In sum, the disparate exclusion of minority candidates at the first stage of the selection process was not ameliorated by the favorable end result because excluded candidates were deprived individually of the opportunity for promotion.
 
 
 46
 Although Teal is a Title VII case, we shall assume that the principle for which it stands is applicable in a Title VI case as well.[12] Nevertheless, the applicability of that principle to the case under advisement is not at all clear. First, this case, unlike Teal, does not present a situation in which one factor used in an evaluative process harms some individuals of a particular racial group even though the process as a whole benefits that racial group; rather, Lindley's formula benefits all minority older individuals from the start because of the heavily-weighted minority factor in Lindley's formula. Second, unlike the situation in Teal, which involved a step-by-step selection process in which one "step" disparately excluded minority individuals from moving on to the next step and, in turn, deprived them of any opportunity for benefits, see Teal, 457 U.S. at 451, 102 S.Ct. at 2533, Lindley's formula applies a variety of factors simultaneously to determine the appropriate distribution of benefits.[13] Finally, and most significantly, the City's argument would require that Lindley also eliminate the minority factor altogether--the very factor that most favors the City. Unlike the 75+ and rural factors, which do not on their face limit distribution of OAA funds on racial grounds, the minority factor wholly eliminates white older individuals from consideration with respect to 10% of all funds. As such, the factor, viewed in isolation as the City argues all factors must be, constitutes a "criteri[on] ... of administration which [has] the effect of subjecting individuals to discrimination because of their race," see 45 C.F.R. Sec. 80.3(b)(2), in direct violation of the regulation upon which the City bases its claim.
 
 
 47
 However, even assuming the applicability of the Teal methodology, the City's claim still fails. With respect to the 75+ factor, the City offers a raw comparison of population percentages, noting that 13.7% of the State's older individuals are minorities while only 10.7% of those over the age of seventy-five are minorities. The City does not claim in its brief, however, that the difference in these percentages is statistically significant. See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308-11 & nn. 14, 17, 97 S.Ct. 2736, 2742-44 nn. 14, 17, 53 L.Ed.2d 768 (1977). Consequently, the City has not established that use of the 75+ factor, considered in isolation, produces a disparate impact for purposes of Title VI's regulations.
 
 
 48
 With respect to the rural factor, the City notes that only 2% of the State's older minority individuals live in areas designated "rural." Viewed in isolation, the rural factor appears to favor substantially non-minorities. However, it does not appear that Lindley's use of the factor "substantially impair[s] accomplishment of the objectives of the [OAA] program" as it relates to minority older individuals. See 45 C.F.R. Sec. 80.3(b)(2). The factor does not exclude minorities on its face. In addition, as the district court determined, the amount of funds at issue, when the rural factor is viewed in isolation, is small as compared to the overall OAA distribution to Illinois, and the actual benefit to minorities from eliminating the factor is unclear because the City is not required to expend the funds it receives on the basis of its minority older population dollar for dollar on those individuals.[14] Moreover, the regulations specifically recognize that rural Americans in the older age categories have needs that must be addressed and requires that each state "provide assurances that the State agency will spend in each fiscal year, for services to older individuals residing in rural areas in the State [,]" an amount not less than 105% of the amount spent for such services in 1978. 42 U.S.C. Sec. 3027(a)(3)(B) (emphasis added). In light of this statutory provision, elimination of the rural factor, rather than its use, would "substantially impair" the objectives of the OAA.
 
 
 49
 In sum, the factors the City challenges do not have a disparate impact on the State's minority older individuals, do not substantially impair the OAA program as it relates to such individuals, or are substantially justified in light of the purposes of the OAA.
 
 Conclusion
 
 50
 For the foregoing reasons, the district court's decision that a cause of action for enforcing the OAA exists under Sec. 1983, which is the subject of the direct appeal (Nos. 94-3506, 94-3507, 94-3891), is reversed and remanded with instructions that the district court dismiss the City's claim. The district court's decision that the City has no claim under Title VI, which is at issue in the cross appeal (No. 94-3844), is affirmed. In light of our decision on the direct appeal, the district court's decision on the Eleventh Amendment issue is moot.
 
 
 51
 AFFIRMED in part; REVERSED in part.
 
 
 
 [1]
 The area agencies on aging may, but need not be, governmental entities. See, e.g., Appalachian Agency for Senior Citizens v. Bland, 775 F.Supp. 191, 195 (W.D.Va.1991) (considering case involving both private and governmental area agencies on aging). In Illinois, for example, "twelve (12) not-for-profit agencies and one unit of local government serve as area agencies." Supp.App. at 71 (Illinois State Plan on Aging)
 
 
 [2]
 Section 230.45 provides in pertinent part:
 In order for a particular factor to be included in the intrastate funding formula, it must:
 (1) be derived from data which is quantifiable by a PSA;
 (2) be based on data which is derivable from the Bureau of the Census; and
 (3) characterize at least 5% of the state's population sixty years of age and older.
 
 
 [89]
 Ill.Admin.Code Sec. 230.45(c)
 Population 60 years and older (60 k Factor) 41%
 60 k and living in poverty (Poverty Factor) 25%
 60 k and a member of a minority group (Minority Factor) 10%
 60 k and living alone (Living Alone Factor) 7.5%
 Population 75 years and older (75 k Factor) 7.5%
 60 k and not residing in a Metropolitan Statistical Area (Rural 9%
 Factor)
 
 
 [3]
 For example, if a PSA contained 50% of the State's population over age 60 (which receives 41% of all available funds), 25% of its population over 60 and living in poverty (25% of the funds), 20% of its minority over 60 population (10% of the funds), 60% of its population over 60 and living alone (7.5% of the funds), 80% of its population over age 75 (7.5% of the funds), and 0% of its rural population (9% of the funds), the formula would provide the PSA:
 (.50)(.41) + (.25)(.25) + (.20)(.10) + (.60)(.075) + (.80)(.075) + (0)(.09) = 39.25%
 of all OAA funds distributed to Illinois.
 
 
 [4]
 The statute provides, in relevant part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. Sec. 1983.
 
 
 [5]
 Following oral argument, we stayed enforcement of the district court's injunction requiring Lindley to develop a new formula pending our disposition of this appeal
 
 
 [6]
 The City has standing to raise such a claim, assuming that the claim exists. We note that various decisions recognize that "[m]unicipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause," and therefore hold that the municipality "cannot bring a section 1983 claim" against the State. City of E. St. Louis v. Circuit Court for the Twentieth Judicial Circuit, 986 F.2d 1142, 1144 (7th Cir.1993); see also Village of Arlington Heights v. RTA, 653 F.2d 1149, 1152 (7th Cir.1981) (collecting cases). However, the City is not attempting to bring a claim under the OAA in its capacity as a municipal entity created by the State; rather, it is suing as the area agency on aging for the PSA that comprises Chicago. See 42 U.S.C. Sec. 3026(a)(6)(D) (requiring, in pertinent part, that each area agency on aging develop a plan which provides that it will "serve as the advocate and focal point for older individuals within the community by ... monitoring, evaluating, and commenting upon all policies, programs, hearings, levies, and community actions which will affect older individuals"). Therefore, the City, as an area agency on aging, has standing to raise its OAA claim. See Meek v. Martinez, 724 F.Supp. 888, 901 (S.D.Fla.1987) ("[T]he [area agency on aging] is more than a creature of the State, established for the sole purpose of funneling funds to service providers.... [T]he area agencies have the added function of serving as advocates on behalf of the needs of the elderly."); cf. Martinez v. Wilson, 32 F.3d 1415, 1420-21 (9th Cir.1994) (reaching merits of whether OAA claim brought by various cities in their capacities as area agencies on aging was enforceable under Sec. 1983). The area agency on aging is " 'within the zone of interests protected by the [OAA],' which confers 'direct standing' upon it." Appalachian Agency for Senior Citizens v. Bland, 775 F.Supp. 191, 195 (W.D.Va.1991) (commenting upon standing of private area agencies on aging) (quoting Meek, 724 F.Supp. at 901)
 
 
 [7]
 In Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court considered whether violations of a particular federal statute could be enforced under Sec. 1983 without applying the three-part test set forth in Wilder. We have held, however, that Suter "is not the death knell of the analytic framework established in Wilder. " Miller, 10 F.3d at 1319 (citing Clifton v. Schafer, 969 F.2d 278 (7th Cir.1992)); see also Procopio v. Johnson, 994 F.2d 325, 331 n. 9 (7th Cir.1993); cf. Loschiavo v. City of Dearborn, 33 F.3d 548, 551 n. 2 (6th Cir.1994) ("Although some believe that the Supreme Court's recent opinion in Suter superseded the well-established framework set forth in Wilder, this Court has joined other Circuits in concluding that the two opinions may be harmonized.") (citation omitted), cert. denied, --- U.S. ----, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995)
 
 
 [8]
 See Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (holding that Education of the Handicapped Act, which contained provisions for detailed administrative and judicial review, foreclosed Sec. 1983 remedy); Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (holding that Federal Water Pollution Control Act, which authorized the EPA to use both civil suits and criminal penalties to enforce its mandate, and which also provided for citizen suits, foreclosed Sec. 1983 remedies)
 
 
 [9]
 But cf. Meek v. Martinez, 724 F.Supp. 888, 903-04 (S.D.Fla.1987) (holding, prior to Supreme Court's decision in Suter, that "mandatory" nature of OAA indicated that enforcement action under Sec. 1983 existed); Southwest Mo. Office on Aging v. Missouri Dep't of Social Servs., 850 F.Supp. 816, 820 (W.D.Mo.1994) (following Meek in case in which state conceded that formula factor violated OAA)
 
 
 [10]
 In addition to its claim under the Title VI regulations, which is discussed in the text, the City has challenged the district court's refusal, on Eleventh Amendment grounds, to order Lindley to adjust future distributions of funds to compensate the City for losses it suffered under the formula the district court held infirm. Our decision on the direct appeal that the City may not enforce the relevant provisions of the OAA under Sec. 1983 renders this portion of the City's cross appeal moot
 
 
 [11]
 The City submits that it has standing to raise its Title VI claim because it has been harmed directly by Lindley's use of a discriminatory funding formula. It also contends that it has standing because it is representing the interests of its individual citizens who also have been harmed. We agree that the City has standing to raise this claim. The OAA, which provides the funding at issue in the City's Title VI claim, has the explicit purpose of "encourag[ing] and assist[ing] State agencies and area agencies on aging ... to serve older individuals[.]" 42 U.S.C. Sec. 3021(a)(1). Moreover, the statute makes clear that area agencies on aging are to "serve as the advocate and focal point for older individuals within the community." 42 U.S.C. Sec. 3026(a)(6)(D); see also supra note 6. These provisions suggest that the interests of the City, as an area agency on aging, are within the zone of interests protected by the OAA and Title VI, thus conferring direct standing upon it. Cf. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) ("[T]he plaintiff must establish that the injury he complains of ... falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.")
 
 
 [12]
 Cf. Johnson v. Transportation Agency, 480 U.S. 616, 627-28 n. 6, 107 S.Ct. 1442, 1449-50 n. 6, 94 L.Ed.2d 615 (1987) (discussing the relationship of Title VI and Title VII); United Steelworkers of Am. v. Weber, 443 U.S. 193, 206 n. 6, 99 S.Ct. 2721, 2729 n. 6, 61 L.Ed.2d 480 (1979) (same); Georgia State Conference v. Georgia, 775 F.2d 1403, 1417 (11th Cir.1985) (applying test from Title VII to a disparate impact claim under Title VI). Teal has been cited in at least one case involving disparate impact claims under Title VI. See Elston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1420 (11th Cir.1993)
 
 
 [13]
 Cf. Arnold v. U.S. Postal Serv., 863 F.2d 994, 998-99 (D.C.Cir.1988), cert. denied, 493 U.S. 846, 110 S.Ct. 140, 107 L.Ed.2d 99 (1989). In Arnold, the court considered an employment discrimination claim alleging that the defendant's mandatory policy requiring experienced postal inspectors to accept voluntary transfer to major metropolitan areas, promotion from a lower grade along with transfer, or involuntary transfer on the basis of seniority discriminated on the basis of age because the final factor had a disparate impact on those age 40 and older. Id. at 996-99. Assuming such a claim was viable, the court reasoned that, unlike the test at issue in Teal, the "senior-first rule was not a free-standing element of an employment program." Id. at 999. The court emphasized that "[t]hose subject to involuntary transfers ... were not excluded from the voluntary transfer stage." Id. Lindley's formula appears closer to the system at issue in Arnold than it does to the test at issue in Teal. No individual factor in Lindley's formula excludes minorities and nothing in the rural or 75+ factors precludes a PSA from receiving benefits under the minority factor on the basis of its entire minority population
 
 
 [14]
 See R. 102 at 34 (noting that elimination of rural factor would cause an additional 1.05% of OAA funds to be targeted toward minority older individuals state-wide; approximately 0.72% would go to Chicago, which has 69% of the State's minority older individuals)